## Richmond

DORIS TEMPLE KING, ADMINISTRATRIX OF THE ESTATE OF PETER HENRY KING, DECEASED v. CYRUS W. BEALE.

March 11, 1957.

Record No. 4526.

Present, All the Justices.

The opinion states the case.

*Robert Cantor* (*Cantor, McMullan & Cantor*, on brief), for the plaintiff in error.

*George E. Haw*, for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

Cyrus W. Beale filed a motion for judgment in the court below against Doris Temple King, administratrix of the estate of Peter Henry King, deceased, in the sum of $3,000, with interest, based upon an arbitration award made by Robert G. Cabell, as arbitrator, pursuant to a written agreement between Beale and Peter Henry King. In an appropriate manner the defendant administratrix asserted the defense, among others, that the arbitration agreement and the arbitrator's authority to act thereunder had been revoked by operation of law by reason of King's death prior to the award, that hence the award was void and no cause of action could be based thereon. The lower court ruled against this contention and there was a verdict for the plaintiff in the amount claimed. To review the judgment entered on that verdict the present writ of error was awarded the administratrix.

On appeal the main contention of the administratrix, and the only one we need consider, is the same as that made by her in the lower court.

The material facts are not in dispute and may be summarized thus:

Cyrus W. Beale, a member of the Richmond bar, had rendered sundry legal services to Peter Henry King from June 1, 1941, through July 26, 1943. Shortly after the latter date Beale notified King that because of his health he was retiring from the practice of law and could no longer represent him. Beale told King that his fee for services rendered amounted to $3,000. King thought this charge ex-

cessive and contended that the value of Beale's services did not exceed $150. This difference was not settled and King paid Beale nothing on account.

In the spring of 1948, Robert G. Cabell, a member of the Richmond bar, whom King had employed as his counsel, deemed it necessary in the prosecution of a certain suit on behalf of King to obtain from Beale certain papers and documents, the property of King, which had come into Beale's possession while acting as counsel for King. Beale refused to surrender these papers voluntarily to Cabell, claiming a lien thereon for his services rendered to King. King showed a willingness to pay the fair value of Beale's services, but insisted that the charges were excessive. To resolve the situation, Beale and King entered into an agreement, which was later reduced to writing, to submit to Cabell, as arbitrator, the determination of the fair amount due to Beale. As part consideration for this agreement Beale delivered the King papers to Cabell to whom they were of considerable assistance in the prosecution of the litigation. The arbitration agreement executed by the parties is copied in the margin.[1]

Shortly after the arbitration agreement was signed Beale gave Cabell a detailed statement of his account for services rendered King. On several occasions in the summer and fall of 1948, Cabell called upon King for his statement as to the value of Beale's services. King

---

[1] "June 21, 1948

"Messrs. Cyrus W. Beale
 and Peter King
"Richmond, Virginia

"Gentlemen:

"At a meeting between us, held in Mr. Beale's office approximately three weeks ago, it developed that Peter King was indebted to Mr. Beale in some amount for legal services rendered by Mr. Beale prior to the organization of A. D. Price Funeral Service, Incorporated, and for work incident to organizing this company. At that time Mr. Beale indicated what he felt his services were worth, and this sum, in Peter King's opinion, was quite excessive. It was then agreed between the two of you that I should act as arbitrator in this matter, and that each of you would submit to me detailed statements with respect to these services, so as to enable me to reach some conclusion. It is my understanding that each of you has agreed to be bound by my findings; that Peter King will promptly pay to Mr. Beale any sum which I might conclude as being fair under all the circumstances, and that Mr. Beale will accept this sum in full and complete satisfaction of all of his claims of every character and description against Peter King.

"In making a determination in this matter, I am, of course, depending upon each of you to present to me as fair and impartial a statement as is possible, which I, in turn, will consider to the best of my ability. I do, however, reserve the right to confer with such attorneys and businessmen as I may desire in order that I may have

furnished a penciled memorandum which Cabell found to be unintelligible. Although Cabell asked King to clarify or amplify this statement, he never did so. Finally, Cabell set the arbitration matter for hearing on March 28, 1949, and so notified the parties. On March 25, three days before the date set for the hearing, King died and the hearing was, of course, postponed.

On April 1, 1949, Doris Temple King, the daughter of Peter Henry King, qualified as administratrix of his estate and employed Cabell to assist her in settling the estate. In discussing matters incident to the settlement of the estate Cabell advised her that the arbitration proceeding was pending and that since he was acting as arbitrator at the joint request of King and Beale, he could not represent her, the administratrix, in that matter. He set the arbitration proceeding for hearing on April 21, and so notified Beale, the administratrix, and Alberta King, the widow of the decedent.

On the day appointed Beale, accompanied by three members of the bar, appeared and testified before Cabell, the arbitrator. While this testimony is not incorporated in the present record presumably it related to the value of Beale's services. The administratrix and her mother likewise appeared before the arbitrator. They were not representd by counsel nor did they testify or offer any witnesses or take part in the proceedings. The administratrix suggested that "a Mr. Bowman" who had been employed by her father as bookkeeper and auditor might be able to throw some light on the matter. She was told that she might have this witness appear before the arbitrator. However, she did not do so.

In the present case the administratrix testified that she did not comprehend the nature and purpose of the arbitration proceeding; that she understood that Cabell, who was representing her in the settlement of the estate, was acting as her counsel in the arbitration pro-

---

from them independent views as to the value of Mr. Beale's services to guide me in reaching my conclusions.

"I respectfully request that each of you sign the original of this letter and the two carbon copies thereto attached, so that all three of us may have in our files this evidence of our mutual agreement with respect to this matter.

"Very truly yours,
"R. G. Cabell

"The foregoing embodies the understanding between Cyrus W. Beale, Peter King and Robert G. Cabell.
"Peter King
"Cyrus W. Beale"

ceeding. Cabell, on the other hand, insisted that he made it plain to her that he was not her counsel in this particular matter.

Cabell further testified that he had observed that the administratrix was quite well educated and was cognizant of business matters. He said: "It was my understanding that Doris King agreed that the arbitration proceeding should proceed." However, both Beale and the administratrix testified that there was no agreement between them that Cabell should act as arbitrator of Beale's claim against the decedent's estate. Indeed, Beale testified that he never conferred or talked with the administratrix about the matter.

On August 11, 1949, Cabell entered the award upon which the present suit was based. The award need not be set out in extenso. Suffice it to say that it sets out that it is based upon the arbitration agreement between Beale and King, the reasons for the execution of the agreement, the death of King on March 25, 1949, the hearing before the arbitrator on April 21, 1949, at which the various parties were present, the evidence of the witnesses given before the arbitrator, the finding that the estate of King was indebted to Beale in the sum of $3,000 for services rendered, and that such amount was due and payable on July 26, 1943.

The contention of Beale, which was adopted by the lower court, is that since he, as a consideration for entering into the submission agreement, surrendered to King's attorney certain valuable papers which were the property of King and on which he (Beale) had a possessory lien to secure the payment of his claim for services rendered,[2] the submission agreement was irrevocable by King during his lifetime and irrevocable by operation of law by King's death.

[■ A common-law arbitration agreement such as that with which we are concerned consists of two elements: A contract between the parties whereby they mutually agree to submit their controversy to a named arbitrator, and a grant of power by each party authorizing the arbitrator to act in his behalf and settle and determine the matter in controversy. If one of the parties to the arbitration agreement repudiates it, he thereby terminates the authority of the arbitrator to act for him. The authority of the arbitrator may likewise be terminated by operation of law, which occurs upon the death of a party to the

---

[2] It is well settled that an attorney has a possessory or retaining lien on the papers and documents of his client, that he may retain them until his charges against his client are paid, and that such lien will be lost if he voluntarily parts with possession of them. 5 Am. Jur., Attorneys at Law, §§ 209-218, pp. 388-392; 7 C. J. S., Attorney and Client, § 210, p. 1141.

agreement or the death of the arbitrator himself.

By the great weight of authority such an agreement may be terminated and the authority of the arbitrator ended by either party at any time before an award has been made. This is based upon the principle that the power of the arbitrator to act is a naked power, not coupled with an interest, which rests upon the continuing consent of the parties and that that consent may be withdrawn at any time before the power is executed. Corbin on Contracts, Vol. 6, § 1438, pp. 746-747; Williston on Contracts, Rev. Ed., Vol. 6, § 1919, pp. 5360-1; *Id.*, § 1927-A, p. 5390; Restatement of Law of Contracts, § 550, *Comment a*, p. 1055; 3 Am. Jur., Arbitration and Award, § 59, pp. 891, 892; 6 C. J. S., Arbitration and Award, § 33-a, p. 173; 4 Minor's Institutes, 1878 Ed., p. 141; *Rison v. Moon*, 91 Va. 384, 394, 22 S. E. 165; *Big Vein Pocahontas Co. v. Browning*, 137 Va. 34, 45, 120 S. E. 247.

The courts of Pennsylvania make an exception to this general rule where the submission agreement is based upon an added consideration. This view is thus noted in 3 Am. Jur., Arbitration and Award, § 61, p. 893:

"Generally speaking, since sufficient consideration for an arbitration agreement is furnished by the mutual promises of the parties, so long as it remains purely executory, the mere fact that it may be founded on a valuable consideration will not affect the rule that it is revocable until an award, for, like any other executory contract, it may be broken, leaving the aggrieved party to his action for the breach. On the other hand, the courts of one jurisdiction follow a different rule, not recognized elsewhere, that where an agreement to submit to arbitration partakes of the nature of a contract whereby important rights are gained and lost reciprocally, and the submission is the moving consideration to these acts, the agreement is irrevocable, and the courts cannot take jurisdiction of the matter involved prior to an award." [3]

See also, 6 C. J. S., Arbitration and Award, § 33a, p. 174.

The same rule seems to have been approved in *Guild* v. *Atchison, T. & S. F. R. Co.*, 57 Kan. 70, 45 P. 82, 33 L. R. A. 77, 57 Am. St. Rep. 312. There is a dictum in *Insurance Co. of North America* v. *Kempner*, 132 Ark. 215, 200 S. W. 986, 987, which indicates that the rule may be applied in that jurisdiction. It has not been recognized in other jurisdictions.

---

[3] Several Pennsylvania cases are cited in support of the text.

*Bernhard v. Jones*, 156 Va. 476, 159 S. E. 82, cited by the appellee, Beale, does not support the view that the Virginia court has adopted the Pennsylvania rule. There we held that a party to an arbitration agreement which stipulated that the decision of the arbitrators was a condition precedent to a right of action could not withdraw from the agreement before an award was made. In short, the creditor who undertook to repudiate the arbitration agreement was held to have had no right of action until the arbitration had been executed and the award made. We have no such situation here.

[██] In effect, the lower court applied the above Pennsylvania rule to the case at bar. It held that under its principles the submission agreement was irrevocable by King during his lifetime and was likewise irrevocable by operation of law by King's death.

We are not here concerned with whether we should adopt the Pennsylvania rule and hold that under its principles the agreement was irrevocable by King during his lifetime. The question presented to us is whether the principles of that rule should be applied so as to hold that the agreement was irrevocable by operation of law upon King's death. Without stopping to inquire into the soundness of the Pennsylvania rule, as applied to the first situation, we hold that its principles should not be applied to the present case.

An examination of the cases in which the Pennsylvania rule has been applied shows that all of them involve the right of a party during his lifetime to repudiate an arbitration agreement. Not one of these cases involves the question with which we are here concerned, that is, whether the death of a party to an arbitration agreement by operation of law revokes the agreement and the authority of the arbitrator to act thereunder for the deceased party or his estate. The Pennsylvania rule is based upon the principle that under the stated circumstances a party to an arbitration agreement may not voluntarily repudiate it and thus revoke the authority which he has granted to the arbitrator.

In case of the death of a party to an arbitration agreement, the agreement is revoked and the power of the arbitrator is terminated by operation of law upon the universally accepted principle that the death of the principal operates as an instantaneous and absolute revocation of the agent's power or authority, unless the agency is one coupled with an interest. This elementary principle is thus stated in Mechem on Agency, 2d Ed., Vol. 1, § 652, p. 462: "It is therefore the general rule that the authority of an agent, not coupled with an

interest, is instantly terminated by the death of the principal, *even though it may have been irrevocable in his lifetime;* and that any attempted execution of the authority after that event is not binding upon the heirs or representatives of the deceased principal." (Italics supplied.)

Based upon this principle the authorities are unanimous in the view that the death, before award, of a party to a common-law submission agreement, by operation of law, revokes the agreement and the power of the arbitrator to act thereunder, unless there is an explicit stipulation that the submission shall survive or shall not be revoked by the death of either of the parties. Williston on Contracts, Rev. Ed., Vol. 6, § 1927-A, p. 5390, note 2; Corbin on Contracts, Vol. 6, § 1438, pp. 746-7; 6 C. J. S., Arbitration and Award, § 34-c, p. 177; 3 Am. Jur., Arbitration and Award, § 65, p. 895; 4 Minor's Institutes, 1878 Ed., p. 141; Burks' Pleading and Practice, 4th Ed., § 16, p. 14. A full discussion of the subject is found in *Aldrich* v. *Aldrich,* 260 Ill. App. 333.

This rule obtains in Pennsylvania. See *Bailey* v. *Stewart,* 3 Watts & S. (Pa.) 560, 39 Am. Dec. 50; *Power* v. *Power,* 7 Watts (Pa.) 205, 213. See also, *Potter* v. *Sterrett,* 24 Pa. St. 411, 412, where it is said: "A power is terminated by the death either of the party receiving it, or of the party conferring it: 2 *Kent's Com.* 643."

Accordingly, we hold that the death of King by operation of law revoked the submission agreement and terminated the power and authority which King had granted to Cabell, the arbitrator, to enter the award. Without such authority the award which is the basis of the present suit was void.

 It is argued that this will result in an undue hardship to Beale who by surrendering the King papers lost his lien thereon as security for his claim and cannot be restored to the status quo. The answer is that the death of King and the revocation of the submission agreement by operation of law were contingencies for which Beale might have provided by requiring security of King, before surrendering the papers, or by an express stipulation that the submission agreement should survive or should not be revoked by the death of either of the parties. 6 C. J. S., Arbitration and Award, § 34-c, p. 177; 3 Am. Jur., Arbitration and Award, § 65, p. 895. The agreement here contains no such provision.

 In the oral argument before us it was contended by counsel for Beale that the administratrix had waived the revocation of the

arbitrator's authority and authorized him to proceed with the arbitration. There is no merit in this contention.

In the first place, if the arbitrator's authority was revoked by the death of King it could not be restored by a mere waiver of the administratrix. She could have empowered the arbitrator to act for her decedent's estate by entering into a new submission agreement with Beale. Code, § 8-507, authorizes a personal representative to enter into such an agreement. But, as has been pointed out, the uncontradicted evidence is that no such agreement was entered into, and the award expressly states that it was based upon the original agreement entered into between King and Beale.

Moreover, even if she had the power to do so, there is no showing that the administratrix waived, or indicated that she had waived, the revocation of the submission agreement and the arbitrator's authority to act thereunder in behalf of her decedent's estate. She merely appeared at the hearing pursuant to the notice of the arbitrator who incidentally was her counsel in other matters pertaining to the estate. She took no part in the proceedings, offered no evidence then or later, nor did or said anything to indicate that she was submitting the rights of the estate of her decedent to the determination of the arbitrator.

For these reasons the judgment is reversed, the verdict of the jury set aside, and a judgment will here be entered in favor of the administratrix. Such judgment, however, will be without prejudice to the right of the appellee, Beale, to proceed against the administratrix of the estate of the decedent for the recovery of the fair value of the services rendered by him to the decedent.

*Reversed and final judgment.*

HUDGINS, C. J., dissenting.

This case illustrates the wisdom and soundness of the Pennsylvania rule on submission agreements, which is discussed and quoted in the majority opinion from 3 Am. Jur., Arbitration and Award, § 61, p. 893, and the fallacy of following a rule simply because it has been approved by a greater number of courts. Inasmuch as the question presented is of first impression in this Court, I would adopt the Pennsylvania rule and apply its principles to the facts in this case.

The dominant purpose for which Cabell and King arranged a conference with Beale was to obtain possession and use of the papers owned by King and held by Beale. King acknowledged that he owed

Beale a debt for professional services and the only question in dispute was the amount. King claimed that the value of the services was not more than $150. Beale claimed it was $3,000 and that he had a lien upon the papers as security for the payment of his debt. He was unwilling to surrender his security unless the debt was paid or satisfactory arrangements made for a settlement. In compromise of the respective contentions, Beale agreed to surrender possession of the papers if arrangements were made to determine promptly by arbitration the amount of the indebtedness. This was done.

Beale fully performed all the terms and conditions undertaken by him in the arbitration agreement. He surrendered his security for the payment of the debt. King obtained the main purpose for which he executed the agreement, namely, the possession of the papers which he used successfully in the litigation in which he was then involved. Thereby, Beale forever lost the security for the payment of his debt and King gained benefits that substantially enhanced the value of his estate. Neither party can now be restored to his *status quo*. This makes the agreement much more than a naked power to arbitrate. The ends of justice can be attained only by holding that King had no right to revoke and that his death conferred no additional right upon his personal representative.

In 6 C. J. S., Arbitration and Award, § 33, p. 174, it is said: "The general rule as to the right to revoke a common-law submission to arbitration is sometimes limited to cases involving a naked power to refer a subject of controversy to arbitration, and it is held that, where an agreement partakes of the nature of a contract whereby important rights are gained and lost reciprocally, and the submission is the moving consideration of these acts, the submission can be revoked only by mutual consent. Such agreements and compromises, it is said, should be faithfully adhered to, unless there has been fraud, corruption, or gross misbehavior by the arbitrators."

The declaration in the majority opinion that the judgment in favor of the administratrix is "without prejudice to the right of the appellee, Beale, to proceed against the administratrix of the estate of the decedent for the recovery of the fair value of the services rendered by him to the decedent," is in my opinion of no benefit to Beale. The last item of his account against King was made on July 26, 1943. The arbitration agreement was signed on June 21, 1948, and King's personal representative qualified on April 1, 1949. Beale's right of action for the recovery of the value of the services rendered arose prior

to King's death. Code, § 8-13 limits the right to bring any such action to five years from the qualification of the personal representative. Code, § 26-5 requires a personal representative to plead the statute of limitations in any suit or action brought against his decedent's estate. Confronted with these facts I am unable to see how Beale can hope to institute and maintain successfully a separate and independent action to recover the fair value of his services. Furthermore, if death revoked by operation of law the arbitration agreement as held by the majority there can be no recovery of damages for its breach.

It seems to me that the inevitable and final result of the majority decision is that King's estate has been enhanced both by the value of the legal services performed by Beale and the value of the use of the papers obtained from him pursuant to the arbitration agreement, and conversely, Beale has irretrievably lost the value of the legal services for which he had adequate security until he surrendered his retaining lien in consideration for King's agreement to submit their differences to arbitration.

I would affirm the judgment of the trial court.